IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-284

IMMINENT SURGICAL ASSOCIATES, P.A.,

    Plaintiff,

v.

ASPEN MEDICAL MANAGEMENT, INC.,

    Defendant.

## COMPLAINT

Plaintiff, Imminent Surgical Associates, P.A. ("ISA") is a surgical practice based in Sarasota, Florida. In 2015, ISA contracted with Defendant Aspen Medical Management ("AMM"), a medical billing company based in Colorado Springs, to manage its accounts receivable and ensure ISA was properly licensed with third-party government payers like Medicare. AMM was entrusted with managing essentially all of ISA's revenue, and so AMM's diligence would determine whether ISA was paid in full, in part, or not at all for the work it completed. AMM thus agreed to use its "best efforts" in carrying out its duties.

It turned out that AMM's efforts were materially deficient across the board. Bills were not sent out in a timely fashion, accounts were sent to collections before insurance was even billed, AMM never properly licensed ISA with third-party government payers despite AMM's repeated assurance to ISA that it had done so, and checks were sent to ISA in a tardy fashion. When ISA first discovered and raised these issues in 2019, AMM retaliated and wrote off over five million dollars' worth of outstanding accounts receivable and sent even more debt—which was collectable under any reasonable standard—to third-party debt collectors at a significant discount. Further, AMM has refused to turn over records to ISA and participate in the handoff of ISA's accounts

receivable management since their termination in June 2019. To this day, ISA cannot fully reconstruct AMM's mismanagement because its records are incomplete. ISA cannot follow-up because of her withholding that information. ISA therefore brings this case to recover its lost revenue.

## Parties, Jurisdiction, and Venue

1. This is an action for damages in excess of $75,000.00.

2. Plaintiff, Imminent Surgical Associates, P.A. ("ISA") is a Florida corporation with its principal place of business at 1700 S. Tamiami Trail, Sarasota, Florida 34239.

3. Defendant, Aspen Medical Management ("AMM"), is a Colorado corporation with its principal place of business at 13768 Honey Run Way, Colorado Springs, Colorado 80921.

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and the parties are completely diverse.

5. The Court has personal jurisdiction over AMM because AMM is a Colorado resident and so subject to the Court's personal jurisdiction.

6. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because AMM, the only Defendant, resides in this judicial district.

## Prior Litigation

7. ISA first sued AMM in Florida State Court in Sarasota County on March 25, 2021. In December 2021, that Court dismissed ISA's complaint for lack of personal jurisdiction over AMM.

8. Any applicable statute of limitations is tolled under C.R.S. § 13-80-111 as this case was refiled within ninety (90) days.

9. In addition, as set forth below in more detail, the statute of limitations was tolled given AMM's concealment of the underlying facts which prevented ISA from discovering the misconduct when it occurred.

## General Allegations

10. ISA is a surgical practice in Sarasota, Florida primarily practicing at Sarasota Memorial Hospital ("the Hospital"), a premier full-service hospital just south of the Tampa Bay region on Florida's west coast, and specializing in traumatic injury and intervention.

11. ISA is primarily composed of two doctors, Doctors Ali Al-Rawi and Alan Brockhurst. Dr. Russell Jaicks was previously associated with ISA but recently terminated his association with ISA.

12. AMM is a corporation headquartered in Colorado Springs, Colorado which provides medical billing services to medical service providers like ISA.

13. On February 10, 2015, ISA and AMM entered into a Full Services Accounts Receivable Agreement ("the Agreement") drafted by AMM. Although the Agreement is titled with ISA's name, it states that it is between AMM and Dr. Russell Jaicks; Dr. Jaicks was operating as ISA's agent at the time of the execution of the Agreement. Doctors Al-Rawi and Brockhurst signed at the bottom of the Agreement.

14. The Agreement was for a term of one year, to be renewed automatically unless notice of cancellation was given. The contract automatically renewed until the Agreement was terminated on or about June 30, 2019.

15. Under the Agreement, AMM and ISA worked together to invoice for ISA's services. ISA would see a patient, email the patient's bill to AMM, AMM would then submit the bill to insurance or the relevant payer and receive and forward payment back to ISA. AMM was

3

in charge of collecting invoices submitted by ISA and processing payment from third-parties in exchange for a 7.5% fee on collections. AMM was charged with several responsibilities under the Agreement, including as relevant here:

    a. Achieving "[o]ptimum reimbursement" for the professional services ISA rendered;

    b. Timely claims submission and billing;

    c. Timely patient reimbursement and collection per ISA's policies;

    d. Providing full account management up to the point of accounts write off to bad debt, and;

    e. Using its best efforts to achieve the above.

16. In the context of medical services, billing with insurance or through a state or federal program relies upon accurate use of a very complex medical billing code system, including but not limited to that set forth in the International Classification of Diseases, Ninth Revision ("ICD-9"). (The Tenth Revision, ICD-10, also governed some patient coding at issue here.)

17. In the medical billing industry, it is very common for service providers like ISA and third-party billing specialists like AMM to encounter pushback, denial of payment, and general delay from disputes over the appropriate use of billing codes. There are over 13,000 ICD-9 codes at time of writing. And so AMM was also under a duty to "provide reports regarding third-party payer denials and/or reclassifications as well as provid[ing] recommendations to improve coding." AMM has to use its "best efforts" to "research and recommend" ICD-9 coding improvements to improve accuracy and/or reimbursement.

18. Like any payment processor, it is not unusual for ISA and AMM to seek payment from the government, a private insurer, or an individual and not receive timely payment. Sometimes there is a dispute over the billing code, a delay in processing, coverage denial, or no

money.  When this happens, AMM is authorized only with ISA's permission and prior approval to send the debt to a debt collector.

19.     When debt is transferred to third-party debt collector, that debt collector is entitled to a significant portion of however much is ultimately collected.  Because sending debt to a third-party comes at such a cost, it is heavily disfavored and acceptable only when it is truly doubtful that AMM can collect.

20.     Further, a significant portion of ISA's patients are covered by third-party government payers (e.g., Medicare). All of ISA's physicians must be properly registered and licensed with these government payers to qualify for payment.

21.     AMM assumed the duty of providing licensing services to ISA over the course of the Agreement.  AMM provided forms for ISA physicians to fill out at the time the parties entered into the Agreement and continued to follow up to request more information.  AMM had to provide accurate and timely licensing and registration to third-party payers to meets it duties under the Agreement and based on its relationship with ISA.

22.     AMM would handle licensure with Medicare, Medicaid, and other third-party government payers for ISA and ensure that ISA's doctors remained properly enrolled in those programs so they could be properly reimbursed.  Because AMM is paid on collections and licensure has a direct impact on the volume of collections, both AMM and ISA benefitted from this engagement.

23.     ISA entrusted the licensure of its physicians to AMM.  AMM failed to inform ISA of the relevant deadlines and other requirements for licensure.  ISA trusted AMM to do that as a material part of the agreement.

24. Unlike other practices, for example radiology, it is highly unusual for trauma physicians to remain in an independent practice and not work within a larger hospital network. ISA thus had unique needs that few third-party payment processors could meet—in particular, coding for trauma-related care. ISA accordingly selected AMM because it understood that it had an unusual degree of competence and experience with the type of billing ISA required.

25. Violating its licensure duty, AMM failed to enroll multiple ISA physicians for reimbursement with governmental third-party payers. Indeed, AMM repeatedly ignored ISA's requests for AMM to enroll physicians, and failed to communicate missed deadlines and missed enrollments. As a result, ISA lost significant revenue for 2015-2020, and it only discovered this lost revenue recently. ISA estimates that its lost revenue from AMM's misconduct exceeds $100,000. Compounding the problem, as explained further herein, AMM hid its failures from ISA for many years.

26. Initially, AMM stated that ISA's physicians had been enrolled for reimbursement by governmental third-party payers and later that some physician's credentials had expired in 2018. However, upon later investigation many of these physicians' enrollments had already expired.

27. In 2019, AMM informed ISA that a few of ISA's physicians' enrollment with governmental third-party payers was set to expire. However, upon later investigation, many of these physicians' enrollment had already expired. ISA did not discover AMM's failure until the end of 2019 and only after Plaintiff had terminated AMM's services and assumed billing responsibility.

28. When ISA assumed responsibility for billing after terminating AMM's services, it discovered that AMM had failed to ever enroll some of ISA's physicians for reimbursement by

6

governmental third-party payers and AMM had allowed the credentials of others ISA physicians to expire and without renewal, despite ISA's requests and the terms of the Agreement.

29. Even now although ISA has been able to partially reconstruct its physicians' licensure history, Plaintiff is unable to properly determine which of ISA's physicians were ever enrolled by AMM for reimbursement by governmental third-party payers because AMM has refused to turn over its records maintained for ISA's billing for years 2015 through 2019.

30. AMM was therefore responsible for enrolling ISA's physicians for reimbursement by governmental third-party payers and for collecting fees for ISA, including from governmental third party payers. AMM breached the Agreement by failing to enroll ISA's doctors, which resulted in significant lost revenue.

31. Per the Agreement, AMM was responsible for timely sending the reimbursement checks from governmental third-party payers and/or patients to ISA at its Sarasota, Florida address and/or depositing those checks in ISA's bank accounts. These checks for reimbursement from governmental third-party payers are time sensitive and must be deposited within a set time or else the payments are subject to expiration. Plaintiff had to repeatedly request AMM to forward these checks to ISA and many of the checks were expired even when AMM did tardily forward those checks.

32. AMM's breaches have caused damages to ISA because of lost revenue that AMM failed to collect for ISA from governmental third-party payers and/or patients and failed to timely provide to ISA from governmental third-party payers and/or patients pursuant to the terms of the Agreement.

33. AMM also breached the Agreement by failing to maintain accurate and complete records and failed to provide those records to ISA at ISA's request. During the pendency of the

Agreement, AMM repeatedly failed to provide records or back-up documentation regarding ISA's billings, which prevented ISA from adequately monitoring and supervising AMM's performance under the Agreement. To the extent that AMM did provide records, the records were incomplete or in a format that prevented Plaintiff from auditing the records or discovering AMM's errors.

34. Further, AMM frequently incorrectly billed ISA patients and failed to include procedures on patient invoices or included incorrect information on patient invoices.

35. This information should have been maintained by AMM pursuant to the Agreement; further, AMM is required to provide its records to ISA when requested.

36. AMM's refusal to turn over ISA's records has caused damage to ISA in the form of lost revenue by preventing ISA from assuming all outstanding invoices and collecting outstanding payments.

37. While timely submission of bills is important in all cases, there are a few categories of bills which are extremely time sensitive.

38. Specifically, insurance coverage for traumatic injuries is not always sufficient to cover all costs, and so such coverage is typically available to service providers, insurance companies, and judgment creditors on a first-come, first-serve basis. In other words, any delay in submitting ISA's bills could mean the difference between collecting 100 cents on the dollar and 0 cents on the dollar.

39. Because of these time pressures, ISA expected AMM to timely process invoices for payment as quickly as possible, and AMM would have known that time lost is collections lost in this context.

40. AMM knew that time was at a premium not only because ISA told it as much but also because it had agreed to implement certain procedural and substantive billing and coding reforms to ensure that ISA is fully compensated for its efforts when insurance is limited.

41. AMM thus also breached the Agreement by failing to timely submit invoices. It is imperative that invoices be submitted immediately in order to collect payments before patient insurance limits are exhausted. AMM routinely failed to submit ISA invoices in a timely manner, resulting in ISA not receiving any payment for its services due to patient insurance coverage and limits being exhausted.

42. When ISA confronted AMM regarding the failure to submit invoices in a timely manner, AMM would assert that the invoices had been timely submitted, but could not produce any records, such as e-mails or facsimile confirmations, to show that the invoices were timely submitted. AMM has further failed to provide to ISA any of its records for the services AMM provided to ISA.

43. AMM was obligated under the Agreement to timely submit all invoices and collect all money due to ISA. AMM breached the Agreement by failing to timely submit invoices, which resulted in damages to Plaintiff because of lost revenue.

44. AMM routinely disregarded ISA's explicit instructions and exhibited a lack of professionalism in all of its dealings with ISA under the Agreement and, further, failed to perform its obligations under the Agreement in good faith.

45. When ISA attempted to counsel AMM regarding its performance and even sought to purchase—at no expense to AMM—new software to improve AMM's performance, AMM refused.

46. When ISA hired a business manager to assist both ISA and AMM in their common enterprise, AMM would regularly refuse to speak with him and did not cooperate with ISA.

47. In Spring 2019, when ISA notified AMM that it would be terminating AMM's services under the Agreement, ISA, according to AMM's own records and statements, had outstanding accounts receivable in the amount of approximately $5,000,000 to $6,000,000. But, after ISA notified AMM of the termination of the Agreement, AMM, immediately and without any explanation to ISA, wrote off over $5,000,000 million in accounts receivable, leaving ISA with only approximately $300,000 in accounts receivable.

48. AMM did not have authority to write off such a large sum of money even if such a decision had been reasonable under the circumstances (and it was not). AMM knew that such a large write off would have to be coordinated with ISA's prior approval as had been the case previously with smaller write offs.

49. AMM failed to notify ISA of the massive write-off and has failed and refused to provide any records to ISA to explain the write-offs, in addition to failing to provide to ISA all of its records for the time that AMM provided services to ISA.

50. Additionally, when ISA notified AMM that it would be terminating AMM's services under the Agreement, AMM sent numerous outstanding invoices for patients to collections companies despite these patients having insurance coverage for the medical services rendered. Aside from the extreme lack of professionalism and good faith, this is also a further breach of the Agreement and caused damage to ISA by resulting in only a portion of ISA's outstanding fees being collected through the collections process, when the full amount could have been collected from the patients' insurance.

51. ISA fully performed all of its obligations under the Agreement, including providing full and accurate information to AMM in a timely manner in order for AMM to perform its services, and making all required payments to AMM.

## **FIRST CLAIM FOR RELIEF**
*Breach of Contract*

52. ISA incorporates Paragraphs 10-51 as if fully set forth herein.

53. ISA and AMM entered into a valid and binding Agreement supported by adequate consideration.

54. AMM breached that Agreement by, inter alia,

   a. Failing to timely process and submit ISA's invoices which deprived ISA of revenue to which it was entitled, and failure to use best efforts to achieve the same;

   b. Failing to timely remit payment received to ISA, leading to expired checks, missed payments, and lost time value of money, and failing to use best efforts to achieve the same;

   c. Failing to ensure ISA and its physicians were appropriately licensed and enrolled in third-party governmental payer providers such as Medicare and Medicaid, and failing to use best efforts to achieve the same;

   d. Failing to provide "full account management up to the point of account[] write off to bad debt," and failing to use best efforts to achieve the same;

   e. Failing to use its best efforts to research and recommend coding improvements;

   f. Failing to use its best efforts to manage ISA's billings and accounts receivable and to work towards "optimum reimbursement";

11

    g. Writing off over five million dollars of accounts receivable without authorization when it was not reasonable or necessary to do so;

    h. Turning over invoices to third-party debt collectors when it was not necessary, appropriate, or reasonable to do so, causing ISA significant lost revenue, and;

    i. Failing to provide ISA's files and documentation when asked and failing to adequately and appropriately respond to ISA's demands under the Agreement by withholding necessary records.

55. AMM's conduct caused ISA damages in the form of lost revenue and continues to cause harm to ISA as ISA still cannot decipher AMM's billing records without the release of further records in AMM's custody and control.

## SECOND CLAIM FOR RELIEF
*Breach of the Implied Duty of Good Faith and Fair Dealing*

56. ISA incorporates Paragraphs 10-51 and Paragraph 54 as if fully set forth herein.

57. AMM's conduct set forth in Paragraph 54 breached the implied duty of good faith and fair dealing.  Specifically, AMM has breached its implied duty by exercising its discretion under the Agreement in bad faith by failing to appropriately respond to inquiries, to maintain adequate records, to accurately represent the status of ISA's licensure, writing off accounts receivable when it was not necessary to do so, turning over accounts receivable to third-party collectors when it was not necessary to do so, and failing to appropriately manage, improve, and maintain ISA's coding practices.

58. These dishonest practices are outside the realm of accepted commercial practices, did not adhere to reasonable commercial standards of fair dealing in the trade, and harmed ISA as set forth herein.

12

### THIRD CLAIM FOR RELIEF
*Negligence*

59. ISA incorporates Paragraphs 10-51 as if fully set forth herein.

60. In the event that the Agreement's plain text does not fully and completely govern all pending claims under that Agreement, AMM's conduct in performing its duties to ISA, as described herein and as discovery will reveal, was negligent.

61. AMM assumed a duty to provide services to ISA.

62. AMM had a duty to exercise reasonable care in the exercise of its duties.

63. AMM failed to exercise reasonable care and caused harm to ISA as a result.

### FOURTH CLAIM FOR RELIEF
*Fraudulent Misrepresentation*

64. ISA incorporates Paragraphs 10-51 as if fully set forth herein.

65. AMM was under a duty to carry out licensure for ISA so ISA could fully participate in government programs for the reimbursement of medical services.

66. ISA inquired of AMM regarding the status of that licensure. Licensure was material to ISA because being appropriately license is a prerequisite to receiving payment from third-party government payers.

67. AMM stated that ISA's physicians had been appropriately enrolled in government programs.

68. In fact, when AMM made that statement ISA's physicians had been unlicensed for years.

69. Based on the information available to it at the time, AMM knew that its statement was false.

70. AMM intended ISA to rely on its representation because AMM had assumed that duty on behalf of ISA and because AMM knew that ISA lacked the means to verify that information—indeed, to this day ISA is not certain about its license status between 2015-2019 given these misrepresentations and AMM's failure to turn over its records.

71. AMM's failures to communicate with ISA and its refusal to turn over records delayed discovery of the extent of its misconduct.

72. AMM's conduct has harmed ISA as set forth herein by causing it significant lost revenue by disqualifying it from reimbursement under third-party government payer programs.

## FIFTH CLAIM FOR RELIEF
*Negligent Misrepresentation*

73. ISA incorporates Paragraphs 10-51 and 64-72 as if fully set forth herein.

74. AMM provided false information to ISA regarding the status of ISA's licensure and ability to participate in government programs.

75. AMM's conduct, if not actively fraudulent, constituted a failure to exercise reasonable care in the course of carrying out its professional duties because AMM should have known that ISA had not been appropriately licensed.

76. ISA justifiably relied on AMM's representations given AMM's assumption of licensure duties and AMM's access to the relevant information.

77. AMM knew that ISA would rely on its representations in this regard because it had assumed those duties.

78. AMM's misrepresentations as to ISA's licensure damaged ISA by causing it lost revenue.

## SIXTH CLAIM FOR RELIEF
*Breach of Fiduciary Duty*

79. ISA incorporates Paragraphs 10-51 as if fully set forth herein.

80. ISA justifiably placed its trust and confidence in AMM to ensure its licensure and, as a result, did not take its own efforts to ensure its timely licensure and did not seek to "double check" AMM's work,

81. AMM therefore acted as ISA's agent and a fiduciary for licensure renewal issues. Indeed, the Agreement specifically states that AMM is ISA's agent.

82. AMM breached this fiduciary duty by, inter alia, failing to exercise reasonable care to ensure ISA's physicians were licensed, by misrepresenting the status of ISA's licenses, and by failing to disclose relevant facts (i.e., the non-licensure) concerning the licensure issue.

83. ISA suffered damages from this breach in the form of its non-qualification to participate in third-party government payer programs.

## SEVENTH CLAIM FOR RELIEF
*Conversion*

84. ISA incorporates Paragraphs 10-51 as if fully set forth herein.

85. In the course of their relationship, ISA submitted billing and treatment records to AMM.

86. AMM also generated its own records, many of which were submitted to the Hospital in the regular course of business.

87. ISA retains an interest in these records.

88. ISA demanded that AMM return its records and AMM has refused.

89. AMM's retention of the records constitutes conversion as AMM is asserting dominion over property belonging to ISA and has refused ISA's demand for return of the property.

90. AMM's conversion has damaged ISA by preventing it from accessing information necessary to determine the extent of AMM's wrongdoing and the extent of ISA's damages.

WHEREFORE, Plaintiff respectfully requests that the Court order the return of ISA's documents and records and enter judgment in its favor and award Plaintiff its damages, costs, and attorney's fees, with interest, against AMM and for such further relief as the Court deems just.

## JURY DEMAND

ISA demands a jury trial on all issues so triable.

Dated:  February 1, 2022

Brent R. Owen (45068)
Sam B. Ballingrud (52077)
Squire Patton Boggs (US) LLP
1801 California Street, Suite 4900
Denver, Colorado  80202
Tel.:  +1 303 830 1776
Fax:  +1 303 894 9239
brent.owen@squirepb.com
samuel.ballingrud@squirepb.com

Attorneys for Plaintiff